Thank you, Judge and Judges of the Court. Good morning. I represent Lucy Delgado. In November of 2015, Lucy purchased a hair care company. Why don't you come over to the podium so we can hear you better. Sure. That mic over there doesn't pick up your voice quite as well. Okay. I represent Lucy Delgado. So Lucy Delgado at the time was 55 years of age. She was living in Bayshore, Long Island. She was a hair care professional. She had some shows to do. She wanted to buy, show some wigs at the show. So before she put the wig on, she wanted to protect her hair. Interestingly, her interest in buying the product that we allege was defectively manufactured. The purpose of the use of the product- I want those two words, the product, which was, what did you just say, say it again. She purchased the product. It was called Robert's Diamond Bond. You said it was defectively manufactured, that's what I thought it looked like. Correct. And basically, we rely upon the doctrine of circumstantial evidence. So you concede that your expert, Dr. Spaeth, you can't rely, there wasn't a sufficient conclusion by him that would have happened. So you're relying on the circumstantial evidence doctrine under New York law. Correct. In order to do that, you have to exclude every other potential cause other than a defect in the product, right? Exactly. Exactly. So how do you exclude the glue? The glue is, the lady testified at her deposition, Lucy testified, that she only used limited, she used dots of glue on the top of the weft. So the weft is the hair that hangs down. It's attached by a cotton strip. And she used little dots. Is that enough to exclude operator error as a cause? If someone says, I tried to be as careful as I can, that they get a trial under New York law, even if there's zero evidence of any defect in the product, that's enough? There's zero evidence that this very minor glue got on her hair. The glue has a warning on it, right? The glue has a warning. The glue is Linnell's glue. It wasn't glue manufactured by Universal Beauty Products. No, but it says, do not put on scalp. Do not use if scalp is injured or irritated. To avoid hair loss, do not pull. So. It was never on scalp. The product forms a hard shell. You put the hard shell on your head, and you attach the wefts to the hard shell. So if the hard shell properly performed, nothing ever got on her hair. And not only that, Judge, but Lucy testified that she took an extra step, that she put a stocking on top of the hard shell so that the glue was never even in touch with the hard shell that was formed when this product congealed. The glue, the little dots of glue were on the stocking that she had. So your answer to my question is that if there's no evidence of a product defect, if someone says, I was just careful, but it could be caused by operator error. That somebody just saying, I was careful that they get a trial under New York law under this doctrine, that would be what we were holding here, right? I'm sorry. Well, I say to the court, most respectfully, that that is complete speculation that the glue got on to. Your expert said, when he was questioned about the glue, said if she uses glue in connection with the product, he says, quote, it would indicate to me in part that there could be a problem with something in her hair, and given that there are multiple components in the hair, it would be difficult to determine which component was causing it. So even your own expert didn't, when asked about the glue, didn't say, it couldn't have been caused by the glue, right? I don't think, Judge Bianco, that he was talking about the glue. He was talking about the components. And there were seven batch sheets that were provided to us, because in the end, Universal never figured out which batch was in the bottle that Lucy Delgado used. So they know. None of the batches, there was no evidence that any of the batches caused it, right? Well, yes. My expert confirmed that there's no testing of the components, and they all conform to a certain, not a single one exceeded the amount such that it would be dangerous. But that is a hypothetical bottle. Universal doesn't know which bottle Lucy used. But we started, Judge Bianco, by saying that it's a manufacturing defect. I rest on circumstantial evidence. And you can take all of the testimony of Dr. Spaeth, and you can put it aside, because that's not where we're going. The lady put the product on her hair. In less than two weeks, she takes it off in the shower. She does it appropriately. And to her horror, her hair comes out. She comes out, she puts it on the side, comes out, she puts it on the side. She comes out, and then she looks in the mirror. Her ex-husband, Mr. Cruz, shows up. At that moment, she's crying. She's hysterical. Her hair has come out. And at the time, two years later, in May of 2018, there was a deposition of Lucy. And Universal said, Ms. Delgado, can you take off the handkerchief that she wears on her head, because she doesn't go out. And she's divorced. And if she meets a man, at some point, if it goes well, she's going to show up. Suppose you had a case with a car, and the allegation was that the brakes were defective. And there was complete testing done of the car. No brake defect at all, right? Brakes look like they're working normally. If the driver says, well, I applied the brakes, I stepped on the brakes, they didn't work, but there's zero indication that the brakes failed. Is it your suggestion that the testimony of the driver would be sufficient to get a trial, that there's something wrong with the brakes, even though the testing showed there was nothing wrong with the brakes? What would your answer be to that? I wouldn't take that case. And I agree with you, Your Honor. That's not a case. But this is a one-time use of a product. I know, but when you say that's not a case, I would suggest to you that when there's no evidence that this product has ever caused to anybody this type of defect, I mean, this type of harm, right? There's no evidence of that. No, we don't know that. We don't know that. And if you take a discovery to see if they've ever gotten any other complaints that someone lost their hair using the product, you didn't ask for that? They allege that there have been no complaints. All right. So this has never happened to anybody who's used this product. She used a glue in conjunction with it, which can cause hair loss if it touches her scalp. And you're telling us, I think, that that's enough, even though the glue could have caused, if it touched her scalp, could have caused this hair loss. You would concede that, right? If the glue touched her scalp, could it have caused this hair loss or not? Not to the extent that it occurred, because Dr. Wininger said she had circular patterns of hair loss. And two years after, when she took off the kerchief at the deposition in 2018, she still had substantial portions of hair that were missing. So it doesn't, Judge Banco, occur with a dot of glue. All right. Is there any, you said it was nearly two weeks that she had it on. Is there any evidence to suggest that two weeks may have been longer than it should have been, may have been part of the cause? May have been. But no evidence was brought forth by the defendant to say that she should have taken it off. She said she had itching within 24 hours. So if the glue had touched her scalp and she kept it on for two weeks after the itching started, after 24 hours, that could have caused that amount of hair loss, right? Could have, but that is sheer speculation. And- I know, but you have to exclude all possible causes. That's under this, when you're operating on circumstantial evidence, they put forward something like the glue. You have to, your burden, it's your burden. This burden shifts to you to exclude every possible cause. And you just keep saying it's speculation. But I don't know why it's speculation if the glue can cause hair loss. She didn't, the record is clear, Judge, that she didn't use that- I think that's the key issue. Okay, well, let's hear from your adversary. All right. If I might. But you have two minutes for rebuttal. Sure, Judge. Let's hear from them. Good morning, Your Honors. I really don't have so much more to add. I think Judge Brown got it corrected. There's an insurmountable hurdle here that you have to show some sort of causation. We have a product that you can still buy that's on the market today. It's widely used, and Plainton's own expert testified under oath that our product is similar to the other products that are for sale. And he also agreed that there would be absolutely no need for any type of warning on this product that it would cause hair loss. Plainton's counsel is making an argument that he doesn't have to show causation under a circumstantial evidence. The case that I learned in law school for a revsib's case is that air conditioner falling out of the window or a potted plant falling out of the window, I could have a pillow and an air conditioner fall out of the window. And Plainton's counsel, I think, is putting forward an argument that he wouldn't have to show that the pillow caused any injuries if that was my product. But I don't even think he gets to circumstantial evidence. I have a product that there's just absolutely no evidence that causes hair loss. And there's allergies, there's, as you mentioned, the glue, and the treatment here that the doctor prescribed was for a fungus anti-allergy shampoo that was prescribed. So not only is there no evidence, but the indicators are that it wasn't my product, and it wasn't my client's product. And I'm not really sure what else they can do except for using the same approved preservatives that everybody else is using for the same product. What about the argument that they've excluded the possibility of the glue through her deposition testimony? What's your response to that? Well, just like you questioned, first of all, she didn't use the product as directed. Even the hair net is not in the instructions of what to use. And it could have, for all we know, caused an allergic reaction by the plaintiff. She didn't understand that she had to use a conditioner both before and after. So it's definitely open for the fact that she may have made a mistake. What evidence is there that a hair net causes hair loss? I don't understand. She could have had a, plaintiff's expert says that allergies can cause hair loss under certain conditions. She could have an allergic reaction to the hair net, for all we know. We don't have the hair net. It could have been caused in any other ways. I once used the same shampoo over and over again, and I took a shower with it, and I got a rash all over my body. It was a one time occurrence that occurred to me. That might have been what happened to you. Did you sue anybody? I'm sorry? Did you sue anybody? I did not sue anybody. I used a different shampoo next time. Does it matter that the product that she used, that particular product, that batch, as Mr. Zolan pointed out, wasn't able to be tested? Does that matter or not matter? Well, we gave them all the possible batches, and that was open to be tested, and they chose not to. I don't see how choosing not to test the batches gets them to res ipsa. And as I mentioned, even under a res ipsa analysis, the case fails. All right. Thank you. Thank you. Okay, Mr. Zolan, you have two minutes to respond. Thank you, Your Honor. Thank you, Your Honors. It's not about the components. The lady puts the product on, two weeks later, substantial portions of her hair come out. That is res ipsa. And that's supported by this court in Bozic and in Zsa Zsa Jules, and we rely on that. What Judge Brown said, maybe alternative causes, such that I cannot use circumstantial evidence, is dermatitis, fungal infection, stress, iron deficiency, aging, or menopause. That's all true, but it doesn't happen within two weeks. And therefore, it is a manufacturing defect that I can't figure it out, but it happened. And to say that little dots of glue took all of the lady's hair out, there's nothing in the record to support that. Thank you. I have one question. I beg your pardon. No, it's okay. It's not a central question, but I'm just curious. She alleges that she sent them some of their hair, the product, and a photo of the product. And their notes of their person indicates that the product itself, the bottle, was not included. Am I getting that right? That she says, I sent them the bottle? Yes, exactly. No, no, she sent, yeah, she sent a photo of the bottle and the bottle itself. My question to you is, if you were sending the bottle itself, why would you send a photo of the bottle if the bottle is included in the mailing? And also, in your letter, you sent a letter on July 12th confirming what had been mailed back. And you note, we got the hair, although not all of it, I guess. But you didn't even mention in there, like, where's the bottle? So why would she have taken a picture of the bottle if she included the bottle? Your Honor, she's not as smart as anybody in this room. She's just a person who wants to put extensions on her hair and look good. What happened is, Barry Williams is the chemist, and I point out in my reply brief, and in the brief in chief, that he said at page 30 and 31, if there's a problem with, if there's an alleged problem with the product, it is the policy of universal beauty products that we ask the person to send the product in. She said I sent the product in. I asked them, what measures do you have to make sure that when something comes to universal product at 500 Wall Street in Glendale, Illinois, how does that get routed to anybody? And no one could explain it, and if they want it back because it's their company policy to get it back, they could have contacted Lucy. My letter, I'm doing ten different cases in a day. If I forget something, don't blame her for what I left out of my letter. I wasn't suggesting, I'm not blaming her. No, no, no, it's okay, I don't mean that. But I'm just saying the bottle, it's their policy to get the bottle, but they don't live by the policy. All right, all right, thank you, thank you both. We'll reserve decision. Thank you, Your Honor.